988 So.2d 910 (2007)
TRINITY MISSION OF CLINTON, LLC d/b/a Clinton Health & Rehabilitation Center, Trip Francis and Jan Hampton, Appellants
v.
Mike BARBER Individually and for and on Behalf of the Wrongful Death Beneficiaries of Laurentine Barber, Deceased, Appellee.
No. 2005-CA-02199-COA.
Court of Appeals of Mississippi.
August 28, 2007.
Rehearing Denied December 11, 2007.
*914 John L. Maxey, Jackson, Heather Marie Aby, attorneys for appellants.
J. Christopher Klotz, W. Eric Stracener, Joshua Aaron Turner, Jackson, attorneys for appellee.
Before LEE, P.J., BARNES and CARLTON, JJ.
CARLTON, J., for the Court.
¶ 1. Mike Barber filed a wrongful death suit against Trinity Mission Health and Rehabilitation Center of Clinton, LLC alleging that his mother, Laurentine Barber, suffered personal injuries during her residence at Trinity, from which she died. Trinity filed a motion to compel arbitration which was denied by order of the Circuit Court of Hinds County. Trinity appeals to this Court and asserts that the lower court erred in refusing to enforce the arbitration provision contained in the admission agreement. We find error and reverse and remand.

FACTS
¶ 2. On October 23, 2003, Ms. Barber was admitted to Trinity, a nursing home providing shelter, food, custodial care, and medical care to the aged and/or infirm. Upon admission to the facility, Mr. Barber entered into an admissions agreement on his mother's behalf, signing as her "responsible party;" however, Ms. Barber's signature does not appear on the document. The admissions agreement signed by Mr. Barber contained an arbitration provision which is central to this appeal.
¶ 3. On May 25, 2005, Mr. Barber filed a wrongful death suit in the Circuit Court of Hinds County, First Judicial District, alleging that Ms. Barber suffered personal injuries during her residence at Trinity, which led to her death. On June 27, 2005, Trinity filed a motion to dismiss or, in the alternative, to stay proceedings and enforce mediation and/or arbitration. In response, Mr. Barber sought to have the agreement and the arbitration provision contained therein declared unenforceable. The lower court entered an order on October 25, 2005, denying Trinity's motion to dismiss and/or compel arbitration and granting mediation. In her order, the trial judge reasoned that: (1) the admission agreement, containing an arbitration provision, is complex and ambiguous, (2) the resident, Laurentine Barber, did not execute the admission agreement, (3) no evidence was presented to the Court as to why she did not sign the admission agreement, (4) no evidence was presented to the Court that the resident was incompetent, (5) no power of attorney was in place for someone to act on behalf of Laurentine Barber, (6) not all of Plaintiff's claims are encompassed within the admission agreement. The arguments advanced by the parties in this appeal require us to determine whether the trial court erred in finding the arbitration provision unenforceable.

STANDARD OF REVIEW
¶ 4. We employ a de novo standard of review to the denial of a motion to compel. Vicksburg Partners, L.P. v. Stephens, 911 So.2d 507, 513(¶ 9) (Miss.2005). The Federal Arbitration Act ("FAA") provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in *915 equity for the revocation of any contract." East Ford, Inc. v. Taylor, 826 So.2d 709, 713(¶ 11) (Miss.2002) (citing 9 U.S.C. § 2). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).
¶ 5. "In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." East Ford, 826 So.2d at 713(¶ 9). The second prong asks "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." Id. at 713(¶ 10) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

DISCUSSION

1. Federal Arbitration Act
¶ 6. As a threshold determination, this Court must consider whether the admissions agreement is within the purview of the FAA. Stephens, 911 So.2d at 513(¶ 13). The FAA governs written agreements to arbitrate contained in contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. Trinity argues that the admissions agreement at issue affects interstate commerce in such a way as to invoke the provisions of the FAA. Mr. Barber argues that Trinity has not put forth any proof to support this proposition.
¶ 7. In Stephens, our supreme court held that arbitration agreements contained in nursing home admissions agreements affect interstate commerce and are thus governed by the FAA. Stephens, 911 So.2d at 515(¶ 16) ("[S]ingular agreements between care facilities and care patients, when taken in the aggregate, affect interstate commerce."). The court reasoned that the general practice of nursing homes affects interstate commerce by "[r]eceiving supplies from out-of-state vendors and payments from out-of-state insurance companies or the federal Medicare program. . . ." Id. at 515(¶ 17).
¶ 8. Under Stephens, we find that the arbitration provision at issue is part of a contract which, when taken in the aggregate, affects interstate commerce. Id. at (¶ 18). The FAA applies to the arbitration provision in the instant case.

2. Whether a valid agreement to arbitrate exists between the parties
¶ 9. Trinity argues that the arbitration provision is valid and enforceable. They contend (1) that Mr. Barber had the authority to bind his mother under Mississippi Code Annotated Section 41-41-201 (Rev.2005), (2) that Mr. Barber had the authority to bind Ms. Barber based on principles of agency, and (3) that Ms. Barber received the benefits of the contract and should be bound to the provision for this reason, notwithstanding her status as a non-signatory. Conversely, Mr. Barber argues that there is no valid agreement to arbitrate. He claims that Ms. Barber did not sign the admissions agreement, and thus she and her estate are not bound by the arbitration provision. Mr. Barber further asserts they had no authority to bind Ms. Barber to the admissions agreement.
¶ 10. To determine whether a valid agreement to arbitrate exists between the parties, we apply ordinary principles of *916 contract law. Terminix Int'l, Inc. v. Rice, 904 So.2d 1051, 1055(¶ 9) (Miss.2004) (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).

A. Authority to bind under agency principles
¶ 11. Trinity asserts that an agency relationship was created based on Mr. Barber's apparent authority. They contend that, by executing the admissions agreement, Mr. Barber held himself out as having the authority to bind his mother and to engage the services of Trinity, who in turn, believed that he had the authority to bind his mother. Mr. Barber argues that this issue is without merit because Trinity provided no proof to the lower court to make a determination of agency.
¶ 12. A principal is bound by its agent on the theory of apparent authority only when the third party can show "(1) acts or conduct of the principal indicating the agent's authority, (2) reasonable reliance upon those acts by a third person, and (3) a detrimental change in position by the third person as a result of that reliance." Eaton v. Porter, 645 So.2d 1323, 1325-26 (Miss.1994) (citations omitted). The party seeking to establish an agency relationship bears the burden of proving it. McFarland v. Entergy Miss., Inc., 919 So.2d 894, 902(¶ 25) (Miss.2005) (citing Highlands Ins. Co. v. McLaughlin, 387 So.2d 118, 120 (Miss.1980)).
¶ 13. Trinity incorrectly argues that an agency relationship was created because Mr. Barber held himself out as having the authority to bind his mother. Mississippi law requires that the acts or conduct indicating the agent's authority be performed by the principal, not the agent. Eaton, 645 So.2d at 1325-26. In the instant case, there is no evidence in the record that Ms. Barber, by acts or conduct, represented to Trinity that Mr. Barber had the authority to bind her to the admissions agreement. Trinity filed no affidavits with the lower court and no testimony has been taken in this case by deposition or otherwise to establish an agency relationship. Thus, we are left only with the existence of the admissions agreement and the unexplained absence of Ms. Barber's signature on the document.
¶ 14. The record contains no proof of acts or conduct on the part of Ms. Barber indicating that Mr. Barber possessed the authority to bind her to the admissions agreement. Therefore, this issue is without merit.

B. Authority to bind under the Health Care Surrogate Act
¶ 15. Trinity argues that Mr. Barber had the authority to bind his mother in health care matters pursuant to the Uniform Health-Care Decisions Act. Miss. Code Ann. §§ 41-41-201 through XX-XX-XXX (Rev.2005). They contend that section 41-41-211 authorizes a surrogate to contractually bind the patient on whose behalf he acts. Trinity further asserts that the authority to contractually bind the patient includes the right to bind the patient and her estate to arbitration. Mr. Brown argues that he had no authority to act as his mother's surrogate because there is no evidence that his mother was incapable of handling her own affairs, and thus, he had no authority to bind her to the admissions agreement.
¶ 16. Section 41-41-211 provides that:
(1) A surrogate may make a health-care decision for a patient who is an adult or emancipated minor if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the *917 agent or guardian is not reasonably available.
(2) An adult or emancipated minor may designate any individual to act as surrogate by personally informing the supervising health-care provider. In the absence of a designation, or if the designee is not reasonably available, any member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate:
(a) The spouse, unless legally separated;
(b) An adult child;
(c) A parent; or
(d) An adult brother or sister
. . . .
(7) A health-care decision made by a surrogate for a patient is effective without judicial approval. . . .
Miss.Code Ann. § 41-41-211(1), (2), and (7).
¶ 17. Our supreme court recently addressed this issue in Covenant Health Rehab of Picayune, L.P. v. Brown, 949 So.2d 732, 736-37(¶ 10) (Miss.2007). In Brown, the plaintiffs, administrators of the estate of their deceased mother, filed a wrongful death suit against the nursing home in which their mother resided prior to her death. Id. at 735(¶ 1). An adult daughter of the deceased signed the admissions agreement as "responsible party" for her mother upon admission to the facility. Id. at 735-36(¶ 5). The trial court denied the defendants' motion to compel arbitration. Id. On appeal, the Mississippi Supreme Court held that the adult daughter of the patient, as a surrogate, had the authority to contractually bind her mother in health care matters under section 41-41-211. Id. In reversing the trial court's denial of the motion to compel, the court in Brown impliedly held that the surrogate's authority to contractually bind the patient includes the authority to bind the patient to arbitration. Id. at (¶ 10). The patient in Brown was found to be incapacitated within the meaning of section 41-41-211(1). Id. The court reasoned that "[b]y virtue of admission by her representatives and corroboration by her admitting physician, she was capable legally of having her decisions made by a surrogate." Id.
¶ 18. In the instant case, there is no evidence in the record to suggest that Ms. Barber was incapable of handling her own affairs at the time the admissions agreement was signed. Trinity introduced no medical records or testimony from Ms. Barber's primary physician, nor from her admitting physician. While the court in Brown did not strictly construe section 41-41-211 so as to require that the determination of incapacity be made by the patient's primary physician, as contrasted from the admitting physician, we do not interpret the Brown decision to diminish the requisite proof of incapacity beyond its holding.
¶ 19. In accordance with Brown, we find that section 41-41-211 authorizes a surrogate to contractually bind an incapacitated patient in health care matters. We further interpret the Brown decision to authorize the surrogate to bind the patient and her estate to arbitration if the admissions agreement contains an arbitration provision otherwise valid and enforceable. To this extent, we agree with Trinity, and acknowledge that, as per Brown, Mr. Barber would have been authorized to bind Ms. Barber and her estate to arbitration were she first properly determined to be incapacitated. However, we find that proof as to Ms. Barber's incapacity was insufficient to statutorily authorize Mr. Brown to make a health care decision for her as a surrogate pursuant to section 41-41-211.

*918 C. Third-Party Beneficiary

¶ 20. Trinity argues that Ms. Barber has received services from their facility based on the terms and conditions of the admissions agreement, thereby benefitting from the same. Trinity asserts that Ms. Barber as well as her wrongful death beneficiaries are estopped from avoiding the arbitration clause because she has received the benefits of the contract which was executed directly for her benefit. Miss. Fleet Card, L.L.C. v. Bilstat, Inc., 175 F.Supp.2d 894, 902 (S.D.Miss. 2001). Mr. Barber argues that there was no valid agreement between Trinity and Ms. Barber as she did not sign the contract, and asserts further that Trinity has cited no authority to support the proposition that a non-signatory may be bound by an agreement to arbitrate.
¶ 21. "[A]rbitration agreements can be enforced against non-signatories if such non-signatory is a third-party beneficiary." Adams v. Greenpoint Credit, LLC 943 So.2d 703, 708(¶ 15) (Miss.2006) (citing Smith Barney, Inc. v. Henry, 775 So.2d 722, 727 (¶¶ 18-20) (Miss.2001); see also Terminix Int'l, Inc. v. Rice, 904 So.2d 1051, 1058 (¶¶ 27-29) (Miss.2004). Our supreme court has stated in regards to a third-party beneficiary to a contract that:
In order for the third person beneficiary to have a cause of action, the contracts between the original parties must have been entered into for his benefit, or at least such benefit must be the direct result of the performance within the contemplation of the parties as shown by its terms. There must have been a legal obligation or duty on the part of the promise to such third person beneficiary. This obligation must have been a legal duty which connects the beneficiary with the contract. In other words, the right of the third party beneficiary to maintain an action on the contract must spring from the terms of the contract itself.
Burns v. Washington Savs., 251 Miss. 789, 796, 171 So.2d 322, 325 (Miss.1965) (citing 17A C.J.S. Contracts § 519(4) (1963)).
¶ 22. In the case of Adams v. Greenpoint, father and mother Adams signed and executed a retail installment contract with creditor Bank-America Housing Services for the purchase of a mobile home. Adams, 943 So.2d at 704(¶¶ 2-6). The contract was subsequently assigned to Greenpoint, who drafted monies from the joint checking account of father Adams and daughter Brown. Id. Mother Adams was long deceased at the time the draft was presented, yet the check was signed "`[mother] Adams' by `Authorized Representative Greenpoint Credit.'" Id. Father Adams and daughter Brown sued Greenpoint for an unauthorized draft, and Greenpoint moved to compel arbitration pursuant to an arbitration provision contained in the retail installment contract. Id. The trial court granted the motion; father Adams and daughter Brown appealed. Id.
¶ 23. On appeal, this Court held that father Adams, by virtue of his signature, was bound to arbitrate and that daughter Brown was not because Greenpoint failed to show that daughter Brown was a third-party beneficiary. Id. at 706(¶ 7). The supreme court affirmed the decision of this Court on Greenpoint's petition for writ of certiorari. Id. at (¶ 8). The court found that daughter Brown was not a third-party beneficiary of the contract, stating as follows:
Nothing in the plain language of the arbitration provision indicates a clear intent of the parties to make Brown a third-party beneficiary. She did not sign the contract, was in no way alluded to in the contract, and, based on the record before us, received no benefits *919 from the contract. . . . [T]here is no evidence that the contract was "entered for [her] benefit[;]" id., there is no evidence that any benefit flowed to her as a "direct result of the performance within the contemplation of the parties as shown by its terms[;]" id., or that her suit "spring[s] from the terms of the contract itself." Id. As Brown is not a third-party beneficiary to whom the benefits of the contract attach, she is not bound by the arbitration provision.
Id. at 709(¶ 15) (citing Burns, 251 Miss. at 796, 171 So.2d at 324-25).
¶ 24. While the court in Adams found that daughter Brown was not a third-party beneficiary of the contract signed by her father and mother, the facts of the instant case clearly establish that Ms. Barber was a third-party beneficiary of the agreement signed and executed by Mr. Barber.
¶ 25. The plain language of the admissions agreement indicates the clear intent of the parties to make Ms. Barber a third-party beneficiary. Ms. Barber's care is the sine qua non of the contract. She is named in the contract as the resident to be placed in Trinity's facility for care. It is beyond dispute that the benefits of receiving Trinity's health care services outlined in the admissions agreement flowed to Ms. Barber as a "direct result of the performance within the contemplation of the parties as shown by its terms." Burns, 251 Miss. at 796, 171 So.2d at 324-25. The admissions agreement states that, inter alia, "the facility agrees to furnish room, board, linens and bedding, general duty nursing and nurse aide care, and certain personal services." Trinity had a duty to provide these services to Ms. Barber and these rights "spring from the terms of the contract itself." Id.
¶ 26. We find that the contract between Mr. Barber and Trinity was entered into for the benefit of Ms. Barber and that she is a third-party beneficiary under the contract. As such, she is bound by the arbitration provision contained in the admissions agreement, notwithstanding her status as a non-signatory to the agreement.[1]
¶ 27. We find further that, because the arbitration provision could be enforced against Ms. Barber, it may be equally enforced against her wrongful death beneficiaries. See Cleveland v. Mann, 942 So.2d 108, 117-18 (¶¶ 34-41) (Miss.2006); Smith Barney, Inc. v. Henry, 775 So.2d 722, 726-27 (¶¶ 15-17) (Miss. 2001). Our supreme court has held that "[a] wrongful death suit is a derivative action by the beneficiaries, and those beneficiaries, therefore, stand in the position of their decedent." Carter v. Miss. Dep't of Corr., 860 So.2d 1187, 1192(¶ 17) (Miss. 2003) (citing Wickline v. U.S. Fid. & Guar. Co., 530 So.2d 708, 715 (Miss.1988)). Additionally, the admissions agreement plainly states that the arbitration provision "[s]hall survive the termination for any reason of this agreement and shall survive and shall not be revoked by the death of any party hereto including the Resident. Said provisions shall be binding on the estate of the Resident in the event the Resident is deceased." Because Ms. Barber's claims would have been subject to arbitration, the claims of her wrongful death beneficiaries are likewise subject the arbitration provision.

3. Whether the parties' dispute is within the scope of the arbitration agreement
¶ 28. In her order denying Trinity's motion to compel arbitration, the trial *920 judge found that "not all of [Mr. Barber's] claims are encompassed within the Admission Agreement." Trinity argues that all of the claims asserted are within the scope of the arbitration provision.
¶ 29. The arbitration provision at issue states in pertinent part that "[t]he resident and responsible party agree that any and all claims, disputes and/or controversies between them and the Facility or its Owners, officers, directors or employees shall be resolved by binding arbitration. . . ." All of Mr. Barber's claims arise out of the acts or omissions of Trinity while providing care to Ms. Barber during her residence at the facility. Thus, we find that the dispute between the parties is covered by the broad language of the arbitration provision.
¶ 30. Having determined that a valid agreement to arbitrate exists between the parties, and that the parties' dispute is within the scope of the arbitration agreement, our inquiry now turns to the second prong of East Ford. "Under the second prong, applicable contract defenses available under state contract law such as fraud, duress, and unconscionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act." East Ford, 826 So.2d at 713(¶ 10) (citing Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).

4. Unconscionability
¶ 31. Unconscionability is generally defined as "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party." Entergy Miss., Inc. v. Burdette Gin Co., 726 So.2d 1202, 1207(¶ 11) (Miss.1998) (citations omitted). Mississippi courts have recognized two types of unconscionability, procedural and substantive. Stephens, 911 So.2d at 517(¶ 22) (citations omitted).
¶ 32. In his response to Trinity's motion to compel, Mr. Barber's main contention was that the terms of the admissions agreement were unconscionable. In her order denying Trinity's motion to compel arbitration, the trial judge, without explanation, stated that "the Admission agreement, containing an arbitration provision, is complex and ambiguous." In so finding, the trial judge essentially held the entire admissions agreement to be unenforceable.

A. Procedural Unconscionability
¶ 33. When reviewing a contract for procedural unconscionability, we "[look] beyond the substantive terms which specifically define a contract and focuses on the circumstances surrounding a contract's formation." Id. at 517(¶ 24) (citing Black's Law Dictionary 1524 (6th ed.1990)). "Procedural unconscionability may be proved by showing `a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms.'" East Ford, 826 So.2d at 714(¶ 13) (citations omitted).
¶ 34. Mr. Barber argues that the arbitration agreement is procedurally unconscionable. Specifically, his contentions are as follows: (1) that Ms. Barber lacked the knowledge and voluntariness to waive her right to a jury trial, (2) that the location of the provision in the document is inconspicuous, and (3) that the admissions agreement is filled with complex and legalistic language.
¶ 35. Mr. Barber again argues that Ms. Barber did not sign the contract and, therefore, she cannot be held to have voluntarily *921 and knowingly agreed to arbitrate. He contends that Trinity has cited no authority to support the proposition that a non-signatory may be bound to an arbitration agreement.
¶ 36. To the contrary, Trinity cites Miss. Fleet Card, L.L.C. v. Bilstat, Inc., for the proposition that a non-signatory may be bound to the terms of an agreement to arbitrate as a third party beneficiary or "[u]nder theories of (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/ alter ego, and (5) estoppel." 175 F.Supp.2d 894, 901-03 (S.D.Miss.2001). As previously discussed, Ms. Barber may be bound to the arbitration provision as a third-party beneficiary to the contract executed by Mr. Barber and Trinity, notwithstanding her status as a non-signatory. The relevant remaining determination then is whether the circumstances surrounding the execution of the agreement between Mr. Barber and Trinity evince procedural unconscionability.
¶ 37. Trinity argues that Mississippi law imposes a duty to read the terms of a contract on the parties, such that a party to a contract may not later complain that he did not have knowledge of the terms and conditions of an agreement he signed. MS Credit Ctr., Inc. v. Horton, 926 So.2d 167, 177(¶ 31) (Miss.2006) (holding that a party may not avoid an arbitration provision by claiming that he did not read or understand its terms). We agree. Mr. Barber signed the agreement and will not be heard to complain that he had no knowledge of the arbitration provision. Additionally, we find prior Mississippi Supreme Court decisions in Stephens and Brown to be controlling on this issue.
¶ 38. In Stephens, our supreme court examined an identical arbitration provision in a nursing home admissions agreement for procedural unconscionability. Finding none, the court there stated that:
[T]here were no circumstances of exigency; the arbitration agreement appeared on the last page of a six-page agreement and was easily identifiable as it followed a clearly marked heading printed in all caps and bold-faced type clearly indicating that section "F" was about "Arbitration;" the provision itself was printed in bold-faced type of equal size or greater than the print contained in the rest of the document; and, appearing between the arbitration clause and the signature lines was an all caps bold-faced consent paragraph drawing special attention to the parties' voluntary consent to the arbitration provision contained in the admissions agreement. Under these facts, it can not be said that there was either a lack of knowledge that the arbitration provision was an important part of the contract or a lack of voluntariness in that [the resident and his responsible party] somehow had no choice but to sign.
Stephens, 911 So.2d at 520(¶ 33). Recently in Brown, the court was again faced with the same arbitration clause contained within a nursing home's standard admissions form. Brown, 949 So.2d at (¶¶ 11-13). The court, relying on Stephens, again found no procedural unconscionability in the admissions agreement.
¶ 39. The arrangement of the admission agreements and the arbitration provisions in Stephens and Brown accurately describe the agreement executed by Mr. Barber and Trinity. The record reveals no circumstances of exigency and none are asserted by Mr. Brown. Accordingly, we find no procedural unconscionability in the admissions agreement in the instant case.

B. Substantive Unconscionability
¶ 40. Substantive unconscionability examines the terms of the agreement *922 and may be proven by showing that the terms are oppressive. East Ford, 826 So.2d at 714(¶ 14) (citing York v. Georgia-Pac. Corp., 585 F.Supp. 1265, 1278 (N.D.Miss.1984)). "Substantive unconscionability is present when there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach." Stephens, 911 So.2d at 521(¶ 35) (citations omitted). In order for this Court to find an oppressive term to be substantively unconscionable, we must find that the term "[b]y its very language significantly alters the legal rights of the parties involved and severely abridges the damages which they may obtain." Id. at 521(¶ 38). When interpreting a contract, Mississippi courts adhere to a well-established practice of striking unconscionable terms as void and enforcing the remainder of the agreement without the effect of the unconscionable provisions. Brown, 949 So.2d at (¶ 25) (citing Russell v. Performance Toyota, Inc., 826 So.2d 719, 725(¶ 21) (Miss.2002)); see also Miss.Code Ann. § 75-2-302(1) (Rev.2002).
¶ 41. Trinity argues that the trial judge erred in finding the entire admissions agreement to be unenforceable. They cite Russell and argue that the proper methodology when examining a contract is to strike any unconscionable terms and enforce the remainder of the agreement. Mr. Barber maintains that the trial judge was correct. However, he argues alternatively, should this Court find that the arbitration agreement is valid and enforceable, that several provisions in the agreement be held unconscionable and stricken from the agreement before ordering arbitration. The specific provisions of the admissions agreement will be addressed separately below.
¶ 42. Sections E-5 and E-6 lay out a "grievance resolution process" which allows Trinity to bring suit in court in matters regarding payment for services, while requiring a dispute on any other grounds to be brought in accordance with the grievance resolution process.[2] This process has recently been held substantively unconscionable and stricken from a nursing home admissions agreement. Brown, 949 So.2d at 739(¶ 18) (citing Pitts v. Watkins, 905 So.2d 553, 555-56(¶ 10) (Miss.2005)). Therefore, we find that Sections E-5 and E-6 are unconscionable pursuant to Brown and should be stricken from the admissions agreement.
¶ 43. Section E-7 attempts to impose a limitation on the amount of damages that may be recovered in a dispute between the nursing home and the resident or responsible party.[3] The exact language of this section has twice been held unconscionable by our supreme court. Brown, 949 So.2d at (¶ 16); Stephens, 911 So.2d at 522-23 (¶¶ 39-42). In accordance with Brown and Stephens, we find that Section E-7 is unconscionable and should *923 be stricken from the admissions agreement.
¶ 44. Section E-8 seeks to waive punitive damages in any dispute between the nursing home and the resident or responsible party.[4] This exact clause was also considered in Brown and held to be unconscionable "[d]ue to its potentially significant effect of substantial deprivation to the resident and benefit to the nursing home." Brown, 949 So.2d at 739(¶ 17) (citing Stephens, 911 So.2d at 523-24(¶ 43)). In light of the recent decision in Brown, we find that Section E-8 is unconscionable and should be stricken from the admissions agreement.
¶ 45. Section E-14 requires a party requesting copies of any records to pay a charge of three dollars per page.[5] This clause has been superceded by Mississippi Code Annotated section 11-1-52 which provides:
(1) Any medical provider or hospital or nursing home or other medical facility shall charge no more than the following amounts to patients or their representatives for photocopying any patient's records: Twenty Dollars ($20.00) for pages one (1) through twenty (20); One Dollar ($1.00) per page for the next eighty (80) pages; Fifty Cents (50) per page for all pages thereafter. Ten percent (10%) of the total charge may be added for postage and handling. Fifteen Dollars ($15.00) may be recovered by the medical facility for retrieving medical records in archives at a location off the premises where the facility/office is located.
Miss.Code Ann. § 11-1-52(1) (Rev.2004).
¶ 46. We find that the charge listed in Section E-14 is in violation of Mississippi Code Annotated Section 11-1-52(1) and should be stricken from the admissions agreement.
¶ 47. Section F is the arbitration provision central to this appeal.[6] Again, we find the decisions of Brown and Stephens to be controlling. In Brown, the exact same arbitration provision was challenged *924 as unconscionable. Brown, 949 So.2d at 740-41 (¶¶ 22-25). The court in Brown cited the Stephens decision as controlling because an identical provision was considered by the Stephens court, which found that the provision was not unconscionable. Id. (citing Stephens, 911 So.2d at 521(¶ 37)). Following the reasoning of the Stephens opinion, the court in Brown held that the arbitration provision was valid and enforceable except for "the last sentence of the arbitration provision, which limits liability pursuant to section[] (sic) E-7 and waives punitive damages...." Id. at 741(¶ 23). The court struck this sentence from Section F and enforced the remainder of the arbitration provision. Id.
¶ 48. Consistent with the abovementioned authority, we find that the arbitration provision in the instant case is not substantively unconscionable. However, we find, as did the courts in Brown and Stephens, that the last sentence of Section F is unconscionable and should be stricken from the provision.
¶ 49. We adhere to our practice "of striking unconscionable terms and leaving the remainder of the agreement intact." Id. at 735(¶ 3). We find, under recent Mississippi Supreme Court precedent, that Sections E-5, E-6, E-7, and E-8, are unconscionable and shall be stricken from the admissions agreement. We find that Section E-14 shall be stricken from the admissions agreement because it has been superceded by statute. As to Section F, the arbitration provision, we find that it is not unconscionable under Stephens and Brown. Section F is valid and enforceable against Ms. Barber's wrongful death beneficiaries, except for the last sentence which states: "Consistent with the terms and conditions of this Agreement, the Parties agree that the Arbitrator(s) may not award punitive damages and actual damages awarded, if any, shall be awarded pursuant to Section E.7." We find that, as per Stephens and Brown, this sentence is unconscionable and shall be stricken from the provision.
¶ 50. Accordingly, we hold that the trial court erred in finding the entire admissions agreement to be unenforceable and in denying Trinity's motion to compel arbitration. We direct the trial court to order arbitration. We reverse and remand for proceedings consistent with this opinion.
¶ 51. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, P.J., CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J. AND MYERS, P.J.
IRVING, J., Concurring in Part and Dissenting in Part:
¶ 52. The majority finds a recent Mississippi Supreme Court case, Covenant Health Rehab. of Picayune, L.P. v. Brown, 949 So.2d 732 (Miss.2007), controlling on the issue of whether Mike Barber had the authority under the Health Care Surrogate Act to bind his mother, Laurentine Barber, to the admissions agreement that he signed with Trinity Mission. I agree with the majority that Covenant Health stands for the proposition that a surrogate has the authority under Mississippi Code Annotated section 41-41-211 (Rev.2005) to bind a patient, on whose behalf the surrogate has acted, to an admissions agreement that contains an arbitration clause.[7]Id. at 735(¶ 10).
*925 ¶ 53. However, I cannot agree that Covenant Health speaks to the real issue here: whether Barber, even if Laurentine is found to be incapable of managing her affairs, has the authority to bind Laurentine to arbitration. I agree that under Covenant Health, Barber, as Laurentine's surrogate, would have the authority to contractually bind Laurentine in health care matters. I also agree that in Covenant Health, our supreme court held that the trial court erred in denying the nursing home's motion to compel arbitration. Covenant Health, 949 So.2d at 742(¶ 29). It seems to me, however, that our supreme court may have concluded, without having thoroughly examined the extent of the statutory power of a surrogate, that a surrogate's authority to make health care decisions ipso facto carries with it the authority to sign admissions agreements which contain arbitration provisions. In the discussion that follows, I look at the statutory powers and limitations of a health care surrogate.
¶ 54. Mississippi Code Annotated section 41-41-203(g) (Rev.2005) defines "health care" as "any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect an individual's physical or mental condition." Section 41-41-203(h) (Rev.2005) defines a health care decision as:
a decision made by an individual or the individual's agent, guardian, or surrogate, regarding the individual's health care, including: (i)[s]election and discharge of health-care providers and institutions; (ii)[a]pproval or disapproval of diagnostic tests, surgical procedures, programs of medication, and orders not to resuscitate; and (iii)[d]irections to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care.
A surrogate is statutorily defined as "an individual, other than a patient's agent or guardian, authorized under Sections 41-41-201 through XX-XX-XXX [cited as the Uniform Health-Care Decisions Act] to make a health-care decision for the patient." Miss.Code Ann. § 41-41-203(s) (Rev.2005). It is clear to me that while a health care surrogate has the statutory authority to make all health care decisions for the patient, the decision to sign an agreement to arbitrate is neither explicitly authorized nor implied within the statutory meaning of a "health care decision." Nestling an arbitration provision in a general admissions agreement among other health care provisions does not, in my judgment, convert it into a health care provision.
¶ 55. In Covenant Health, our supreme court did not address the impact or effect of the statutory definitions discussed above. In the absence of any discussion, I must conclude that they were inadvertently overlooked or not brought to the attention of the court. The obvious purpose of a health care surrogate is to facilitate the provision of health care services by a health care provider when the patient is incapacitated and cannot perform that role. A decision regarding arbitration is wholly unrelated to this function. Therefore, I am compelled to conclude that had our supreme court considered the statutory meaning of a health care decision, along with the concomitant power of the surrogate in light of that meaning, its decision *926 in Covenant Health may very well have been different. Further, since Covenant Health omits a significant discussion of a material point, I do not believe we should accord it the precedential value in this case that would otherwise be due had such a discussion taken place. However, I agree with the majority that the case must be reversed because there is no evidence in the record that Laurentine was incapacitated at the time the admission agreement was signed by her son, Barber.
KING, C.J. AND MYERS, P.J., JOIN THIS SEPARATE OPINION.
NOTES
[1] There were no facts presented at trial or stipulated to in the case at bar that would undercut binding precedent that non-signatories may be bound by an arbitration agreement when they are third party beneficiaries.
[2] Section E-5 reads in pertinent part: "In the event a claim, dispute and/or controversy shall arise between the Parties other than regarding matters concerning the payment for services rendered or refunds due, the Parties agree to participate in a grievance resolution process."
[3] Section E-7 reads verbatim: "Should any claim, dispute or controversy arise between the Parties or be asserted against any of the Facility's owners, officers, directors, or employees, the settlement thereof shall be for actual damages not to exceed the lesser of a) $50,000 or b) the number of days that Resident was in the Facility multiplied times the daily rate applicable for said Resident. This limitation of liability shall be binding on the Resident, Responsible Party, and the Resident's heirs, estate and assigns."
[4] Section E-8 reads verbatim: "The Parties hereto agree to waive punitive damages against each other and agree not to seek punitive damages under any circumstances."
[5] Section E-14 reads verbatim: "To compensate for the cost of the professional staff involved in the process, the Parties agree that a charge of $3.00 per page shall be charged for copies of any records requested by legally authorized parties."
[6] Section F reads verbatim: "The Resident and Responsible Party agree that any and all claims, disputes and/or controversies between them, and the Facility or its Owners, officers, directors, or employees shall be resolved by binding arbitration administered by the American Arbitration Association and its rules and procedures. The Arbitration shall be heard and decided by one qualified Arbitrator selected by mutual agreement of the Parties. Failing such agreement each Party shall select one qualified Arbitrator and the two selected shall select a third. The Parties agree that the decision of the Arbitrator(s) shall be final. The Parties further agree that the Arbitrators shall have all authority necessary to render a final, binding decision of all claims and/or controversies and shall have all requisite powers and obligations. If the agreed method of selecting an Arbitrator(s) fails for any reason or the Arbitrator(s) appointed fails or is unable to act or the successor(s) has not been duly appointed, the appropriate circuit court, on application of a party, shall appoint one Arbitrator to arbitrate the issue. An Arbitrator so appointed shall have all the powers of the one named in this Agreement. All Parties hereto agree to arbitration for their individual respective anticipated benefit of reduced costs of pursuing a timely resolution of a claim, dispute or controversy, should one arise. The Parties agree to share equally the costs of such arbitration regardless of the outcome. Consistent with the terms and conditions of this Agreement, the Parties agree that the Arbitrator(s) may not award punitive damages and actual damages awarded, if any, shall be awarded pursuant to Section E.7."
[7] Five justices (Chief Justice Smith, former Presiding Justice Cobb, Justices Easley, Carlson, and Dickinson) did not find Section F (the arbitration provision) in the admission agreement objectionable. Justice Diaz (now Presiding Justice Diaz) in a dissent, joined by Justice Graves, found the entire admission agreement illegal and unenforceable. Justice Randolph, joined by Presiding Justice Waller and in part by Justice Diaz, concurred in part and dissented in part. Justice Randolph found the arbitration provision (Section F of the admissions agreement) unconscionable and unenforceable.