# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-00050-SCT

*BELHAVEN SENIOR CARE, LLC, TREND
CONSULTANTS, LLC, AND C. BRUCE KELLY*

*v.*

*BETTY SMITH, INDIVIDUALLY, AND AS
ADMINISTRATRIX OF THE ESTATE OF MARY
HAYES, AND ON BEHALF OF AND FOR THE
USE AND BENEFIT OF THE WRONGFUL
DEATH BENEFICIARIES OF MARY HAYES*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/21/2021 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | COURTNEY McREYNOLDS WILLIAMS |
| | RICHARD PAUL WILLIAMS, III |
| | S. MARK WANN |
| | KELLY HOLLINGSWORTH STRINGER |
| | JOSEPH SPENCER YOUNG, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOSEPH SPENCER YOUNG, JR. |
| ATTORNEYS FOR APPELLEE: | RICHARD PAUL WILLIAMS, III |
| | COURTNEY McREYNOLDS WILLIAMS |
| | DARYL MATTHEW NEWMAN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED AND REMANDED - 04/06/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Betty Smith brought a negligence and wrongful death lawsuit[1] against Belhaven

Senior Care, LLC (Belhaven)—a nursing home facility in which her mother, Mary Hayes,

---

[1] The complaint also alleged gross negligence, medical malpractice, and statutory
survival claims.

had resided shortly before Hayes's death. Belhaven sought to compel arbitration, citing the arbitration provision in the nursing home admissions agreement Smith signed when admitting her mother. The trial judge denied arbitration, finding that Smith lacked the legal authority to bind her mother to the agreement. Belhaven appealed.

¶2. The nursing home's primary argument on appeal is that under the Health-Care Decisions Act ("the Act"), Smith acted as a statutory healthcare surrogate. Miss. Code Ann. § 41-41-211 (Rev. 2018). So in signing the nursing home admission agreement, Smith had authority to waive arbitration on her mother's behalf. In addition, Belhaven puts forth arguments of direct-benefit estoppel and third-party beneficiary status.

¶3. While Belhaven is correct that under the Act, a surrogate may make a healthcare decision for an adult patient, the surrogate may only do so if the patient "has been determined by the primary physician to lack capacity . . . ." Miss. Code Ann. § 41-41-211(1) (Rev. 2018). And here, while Hayes did suffer from some form of dementia, when admitted to the nursing home, she was neither evaluated by a physician nor was she determined to lack capacity. Indeed, her "Admission Physician Orders" were signed by a nurse practitioner. It was not until eleven days later that a physician evaluated Hayes. And even then, the physician did not deem she lacked capacity. In fact, Belhaven puts forth no evidence that—at any time during her stay of more than a year at Belhaven—*any* physician ever determined Hayes lacked capacity.

¶4. Under the Act, "[a]n individual is presumed to have capacity to make health-care decisions . . . ." Miss. Code Ann. § 41-41-223 (Rev. 2018). And here, Belhaven simply fails to prove the strict requirements of the surrogacy statute to rebut this presumption.

¶5. This Court also finds that Belhaven's direct-benefit estoppel and third-party beneficiary arguments are lacking. Because Belhaven contends that Hayes was incapacitated, she could not knowingly seek or obtain benefits from the agreement. Nor does Smith's largely negligence-based lawsuit seek to enforce the contract's terms or require determination by reference to the contract. So Smith is not estopped from pursuing these claims. *See **Hattiesburg Health & Rehab Ctr., LLC v. Brown***, 176 So. 3d 17, 24 (Miss. 2015).

¶6. Finally, for a third-party beneficiary to exist, there must first be a valid contract. And since Smith did not meet the requirements to be her mother's healthcare surrogate, the arbitration agreement is not a valid, binding contract. *See **id.*** at 21. Accordingly, we affirm the trial court's denial of arbitration.

## FACTS AND PROCEDURAL HISTORY

¶7. On November 7, 2018, ninety-one-year-old Mary Hayes was admitted to Belhaven Senior Care, a nursing home facility in Hinds County, Mississippi. When admitted, Hayes suffered from a number of ailments, including dementia. Hayes's daughter, Betty Smith, executed the nursing home's admission agreement on her mother's behalf. The agreement included an arbitration clause.[2] When admitted to Belhaven, a nurse practitioner signed the

---

[2] The arbitration clause stated that the signer "understood and agreed . . . that any legal dispute, controversy, demand or claim . . . that arises out of or relates to the Admission

3

admission physician orders. Eleven days later, Dr. Timothy Estes saw Hayes for the first time. No other physician evaluated her during these eleven days. Dr. Estes noted that she suffered from dementia and was "cognition impaired." Hayes remained a resident of Belhaven Senior Care until January of 2020, when she was transferred to a local hospital. She died on June 12, 2020.

¶8.     Smith—individually, as administratrix of her mother's estate, and on behalf of the wrongful death beneficiaries of Hayes—filed a complaint against Belhaven in the Hinds County Circuit Court. All claims arose out of Hayes's residency at the nursing home. Belhaven sought arbitration, which the circuit court denied. Belhaven appeals.

## STANDARD OF REVIEW

¶9.     This Court employs a de novo standard when reviewing a trial court's denial of a motion to compel arbitration. *Adams Cmty. Care Center, LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010) (citing *E. Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002)).[3]

## ANALYSIS

¶10.    This Court generally applies a two-prong inquiry in deciding whether a party is bound to arbitration. *Taylor*, 826 So. 2d at 713. We first ask if there is a valid arbitration agreement. And if there is, we decide if "the parties' dispute is within the scope of the

---

Agreement, any service or healthcare provided by the Facility to the Resident or any matter related to the Resident's stay shall be resolved exclusively by binding arbitration."

[3]    In addition, this Court has held that the Federal Arbitration Act (FAA) "is applicable to nursing-home admissions agreements that contain an arbitration clause." *Reed*, 37 So. 3d at 1158 (citing *Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507, 515-16 (Miss. 2005), *overruled on other grounds by Covenant Health & Rehab. of Picayune, L.P. v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009)).

4

arbitration agreement." *Id.* Then, under the second prong we decide "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)). Our focus here rests wholly on the arbitration agreement's validity.

## I.     Direct-Benefit Estoppel

¶11.    Belhaven first argues Smith is estopped from denying the arbitration agreement's validity because she and Hayes benefitted from the admissions agreement. This Court disagrees.

¶12.    "Direct-benefit estoppel involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status, but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Scruggs v. Wyatt*, 60 So. 3d 758, 767 (Miss. 2011) (quoting *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010)). For direct-benefit estoppel to apply, a nonsignatory like Hayes must "embrace the contract" by either (1) "knowingly seeking and obtaining direct benefits from the contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.* And here, Hayes did neither.

¶13.    In fact, there is no evidence Hayes knowingly did anything. She did not seek benefits from the admission agreement—Belhaven indeed argues Hayes was incapacitated when admitted. Nor is Smith suing to enforce the terms of the admission agreement or asserting

5

claims that must be determined by referencing it. This case is akin to **Brown**, in which a nursing home similarly argued direct-benefit estoppel against an allegedly incapacitated resident. **Brown**, 176 So. 3d at 24. There, this Court found that a supposedly incapacitated person cannot knowingly seek and obtain direct benefits from an admission agreement. **Id.** We further rejected the estoppel argument because—just as in this case—the claims sounded in tort. And the estate could pursue those claims "without an admission agreement at all." **Id.** For these same reasons, direct-benefit estoppel does not apply in this case.

## II.     Health-Care Surrogacy

¶14.     Because direct-benefit estoppel does not apply, we consider now the arbitration agreement's validity, applying general contract law. **Reed**, 37 So. 3d at 1158 (citing **Grenada Living Center, LLC v. Coleman**, 961 So. 2d 33, 36-37 (Miss. 2007)). Of the elements required for a valid contract,[4] at issue here is whether Smith had the legal capacity to contract on her mother's behalf. And "[t]he burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." **KPMG, LLP v. Singing River Health Sys.**, 283 So. 3d 662, 674 (Miss. 2018) (quoting **Wellness, Inc. v. Pearl River Cnty. Hosp.**, 178 So. 3d 1287, 1293 (Miss. 2015)).

---

[4] A valid contract is made up of six elements: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation." **Reed**, 37 So. 3d at 1158 (emphasis added) (quoting **Coleman**, 961 So. 2d at 37).

6

¶15. In Mississippi, "[a]n individual is presumed to have capacity to make a health-care decision." Miss. Code Ann. § 41-41-223 (Rev. 2018). And "[o]ur Legislature has very specifically provided the manner in which the presumption that an individual has capacity to make a health-care decision may be rebutted: by a primary physician determining lack of capacity." *Reed*, 37 So. 3d at 1159 (emphasis omitted) (citing Miss. Code Ann. § 41-41-211(1) (Rev. 2009)). So the burden is on Belhaven to rebut the statutory presumption that Hayes had capacity to make healthcare decisions.[5]

¶16. Belhaven tries to do so by insisting Smith was acting as her mother's healthcare surrogate under the Act. A healthcare surrogate is one who "may make a health-care decision for a patient who is an adult . . . if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or . . . is not reasonably available." Miss. Code Ann. § 41-41-211(1), (2)(b) (Rev. 2018).

¶17. Smith disagrees that she qualified as a statutory healthcare surrogate. She points out that when she signed Belhaven's contract, admitting her mother to the facility, no primary physician had determined that Hayes lacked capacity.

¶18. This Court employs a "strict interpretation" of the Health-Care Decisions Act. *Tarvin v. CLC of Jackson, LLC*, 193 So. 3d 633, 637 (Miss. 2016) (quoting *Brown*, 176 So. 3d at 17). Our cases make clear that we "must follow the plain and unequivocal language of [the Act.]" *Id.* at 638 (quoting *Brown*, 176 So. 3d at 23). For Smith to stand in Hayes's shoes as

---

[5] The Act defines capacity as "an individual's ability to understand the significant benefits, risks, and alternatives to proposed health care and to make and communicate a health-care decision." Miss. Code Ann. § 41-41-203(d) (Rev. 2018).

7

her statutory healthcare surrogate, Belhaven had to show that a primary physician determined Hayes lacked capacity. But Belhaven fell short of doing so.

### A. Dr. Estes was not Hayes's primary physician.

¶19. Under the Act, a primary physician is one who has been "designated by an individual or the individual's agent, guardian, or surrogate, to have primary responsibility for the individual's health care or, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes the responsibility." Miss. Code Ann. § 41-41-203(o) (Rev. 2018). Here, Belhaven put forth no evidence of any designation of any primary physician by Smith or anyone with authority to make a designation on Hayes's behalf. There is also no evidence that Dr. Estes treated Hayes before her admission to the facility. So Belhaven had to show Dr. Estes undertook primary responsibility for Hayes's healthcare when she was admitted—and unquestionably it has not done so.

¶20. Considering the required relationship between patient and primary physician, the Court of Appeals has held that the patient-physician relationship required by the Act need not have existed before a patient's admission. In *Estate of Humphrey*, the appellate court reasoned, "the Legislature's use of the present tense 'undertakes the responsibility' of a patient's care in defining the role of a 'primary physician' plainly allows for the situation when a physician 'undertakes' responsibility for a patient's care contemporaneously with the patient's admission." *Est. of Humphrey ex rel. Humphrey v. Tunica Cnty. Healthcare & Rehab LLC*, 329 So. 3d 563, 571 (Miss. 2021) (citing Miss. Code Ann. § 41-41-203(o) (Rev.

2018)). But here, there is no evidence of a contemporaneous patient/primary physician relationship.

¶21. While records show a nurse practitioner signed the "Admission Physician Orders," a nurse practitioner does not satisfy the statutory primary physician requirement. And Belhaven provided zero evidence of any preadmission or contemporaneous primary physician finding that Hayes lacked capacity. In fact, it was not until eleven days after Hayes's admission that a physician even evaluated her.

### B. Hayes was not determined to lack capacity.

¶22. Still, even if this Court deemed Dr. Estes was Hayes's primary physician, we cannot ignore that Belhaven put forth no evidence that—at any point during her more than one year stay at Belhaven—Dr. Estes found she lacked capacity. Again, "[a]n individual is presumed to have capacity to make a health-care decision." *Reed*, 37 So. 3d at 1159 (alteration in original) (quoting Miss. Code Ann. § 41-41-223(2) (Rev. 2009)). And all Belhaven offers to rebut that presumption are Dr. Estes's later records diagnosing Hayes with dementia, indicating she was "cognition impaired."[6] This description is insufficient. The Court of Appeals has said as much, noting that "[m]edical records indicating [one]'s diagnoses and symptomatology are not the equivalent of an affirmative determination by a physician that the patient lacks capacity as defined by the statute." *Est. of Bankston v. CLC of Biloxi, LLC*, 240 So. 3d 456, 459 (Miss. Ct. App. 2017).

---

[6] Records evidencing Dr. Estes's evaluation of Hayes included a section with three possible descriptions of her mental status. Those options were "oriented, cognition impaired, or confused." Dr. Estes chose cognition impaired, which is the apparent middle ground of the descending choices.

9

¶23. While Hayes unquestionably suffered from some form of dementia when admitted, there is no mention of the severity of the condition, much less a finding she lacked capacity. Our precedent mandates we interpret the Act strictly.[7] And the statute requires a finding by a patient's primary physician that the patient is incapacitated. These statutory requirements are clear. If Dr. Estes had indeed found Hayes lacked capacity during some undocumented contemporaneous evaluation during admission, Belhaven could have simply put forth an affidavit from Dr. Estes saying so. But there is no evidence of such an affidavit, so there was no finding of incapacity. Accordingly, this Court finds no error in the trial judge's rejection of the healthcare surrogate argument.

### III.   Third-Party Beneficiary

¶24. Finally, Belhaven insists that Hayes was a third-party beneficiary of the admission agreement. And as such a beneficiary, Belhaven argues, she may not contest its validity. But this Court has rejected similar arguments in arbitration cases in which children of nursing home residents lacked healthcare surrogate authority or apparent authority to bind resident parents. *See Reed*, 37 So. 3d 1155, 1156–57 (Miss. 2010); *Johnson*, 109 So. 3d 562, 563–64 (Miss. 2013). That's because "[f]or a third-party beneficiary to exist, there must first exist a valid contract executed by one with 'legal capacity' to enter the contract." *Brown*, 176 So. 3d at 21 (quoting *Reed*, 37 So. 3d at 1160); *see also GGNSC Batesville v. Johnson*, 109 So. 3d 562 (Miss. 2013). Because Smith did not qualify as her mother's healthcare surrogate,

---

[7] *See Tarvin*, 193 So. 3d at 637 (quoting *Brown*, 176 So. 3d at 17).

10

there was no valid contract. Therefore, Hayes could not be a third-party beneficiary of a nonexistent contract.

## CONCLUSION

¶25. Smith is not estopped from contesting the validity of the arbitration agreement. Nor was Hayes bound as a third-party beneficiary of the agreement. And because Belhaven failed to prove that Smith was her mother's statutory healthcare surrogate when admitting her to the nursing home, its motion to compel arbitration was properly denied. For this same reason, Hayes was not bound by the invalid agreement and is not a third-party beneficiary to a nonexistent contract. This Court therefore affirms the trial court's decision not to compel arbitration.

¶26. **AFFIRMED AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**